US BANKRUPTCY COURT
DISTRICT OF OREGON
2015 MAY 18 PM 3: 57
LODGED____REC'D___
PAID____DOCKETED___

In re:

AMERICAN AMEX, INC.,
A NEVADA CORP

Debtor

)
)
)
)
)
)
)
)
)
)
)

Case No. 12-30656-rld7

MOTION TO DISQUALIFY THE TRUSTEE'S
ATTORNEY

Now Comes, Erwin Singh Braich, sole Trustee of the Peregrine Trust, and hereby

asserts his right to proceed *pro se* and presents this *Motion to Disqualify the Trustee's*

*Attorney* and states the following:

1.    On the issue of *pro se* representation the Bankruptcy Appeal Panel (BAP) has not

required the Trust to retain an attorney.

2.    Federal rules of the *U.S. 9th Circuit* trump local Oregon rules concerning trusts

having to be represented by counsel.

3.    The Peregrine Trust is a living or *inter vivos* trust that is revocable; meaning

the Trust's sole Trustee, Erwin Braich retains the right during his lifetime to amend, change,

revoke or terminate the Trust within his sole discretion.  The Peregrine Trust's sole Trustee,

Erwin Braich is acting on his own behalf, guarding assets as contained within the Trust.

Braich's actions are in accordance with the guidelines of *LBR 9010-1(b)(3)* as he is sole trustee

of the Peregrine Trust, and is representing his own interests as an individual after multiple

counsel for the Trust have been asked to withdraw, or have withdrawn on their own volition.

4.    Trustee Eiler and his attorney David Criswell would like nothing better for the Trust to have to retain counsel again so they can inappropriately assert their position of power over new counsel as they did with the Trust's former counsel at *Karr Tuttle* and *LeClair Ryan*, vis-à-vis their demand that the Trust sign an extortive waiver.

5.    Trustee Eiler and Criswell have other attorneys intimidated and buffaloed also, as evidenced by the attached follow-up letter (*Exhibit A*) and proof of mailer (*Exhibit B*) addressed to local attorney Robert J. Vander Bos.  Mr. Vander Bos' reasons for declining to represent the Trust are exactly why no local attorney is going to take the Trust's case.   Vander Bos would not "jeopardize his standing in two other bankruptcy cases that Eiler and Criswell are also involved in".  According to him, "no other local attorneys will either".   The advice Robert Vander Bos gave the Trust was "pay and go" which is what the Trust is doing.

6.    Trustee Eiler and Criswell had absolutely no difficulty all this time with the Peregrine Trust not having an attorney after *Karr Tuttle* and *LeClair Ryan* violated *FLB Rule 2091-1(c)*. Where were the two of them when this rule was broken, and the Trust's attorneys were permitted to withdraw one day prior to a January 20, 2015 *Hearing* when the required time period for attorneys withdrawing is not allowed  for any reason 21 days prior to a set *Hearing*? Per the attached email (*Exhibit C*), the Trust's attorneys stated something that was untrue. That the *Hearing* would be called off, which it wasn't.   Attorney Criswell and Trustee Eiler presumably rely on bankruptcy rules only when the rules are conveniently in their favor or it suits them.

7.    Prior to resigning, the Trust's attorneys filed Docket 400 in which they argues Eiler and Criswell's misplaced participation in vacating the sale to the Peregrine Trust.  See email

MOTION TO DISQUALIFY
THE TRUSTEE'S ATTORNEY

from attorney Janice Grubin marked *Exhibit D*.

8.   Had counsel for the Trust not inappropriately withdrawn "one day" prior to their attending the January 20, 2015 Hearing the Trust would not have been left at the altar without representation.

9.   As officers of the Court, Trustee Eiler and Criswell failed to present a true picture of Black Diamond to the Court.

10.   It is untrue that the Peregrine Trust has not posted a "penny" toward the purchase of the debtor's assets. Had David Criswell not given the Trust the incorrect name of the debtor for Wells Fargo Bank to issue the Trust's certified bank draft out to, the sum of $25,000 would already be on deposit. Should the Court require this draft it is still in the Trust's possession in its original form. Consequently, the Trust has had to correct this error, as well as, other mistakes made by Criswell and Eiler, in order that Fidelity Title Company may hold the Trust's funds as evidenced by *Exhibit E*.

11.   Contrary to the Trustee's Objection as written and filed by attorney David Criswell, *re Lahijani*, 325 B. R. 282, 290, fn. 13 (9th Cir. BAP 2005) does not say nor did the *Ninth Circuit Bankruptcy Appeal Panel* find that "in the context of a sale or other disposition of estate assets, creditors have standing to appeal but disappointed prospective bidders do not". Mr. Criswell and Trustee Eiler omitted a very important word from this statement which changes the meaning entirely. *Re Lahijani*, actually states "disappointed prospective bidders usually do not have standing to appeal" (*Exhibit F*, under *Notes [13]*. This suggests sometimes they do.

For the word "usually" to have been omitted from Criswell's quote of case law is

unconscionable; and further evidence of Eiler and attorney Criswell's attempts to injury the Peregrine Trust in the eyes of the Court, while the two of them falsify and misrepresent information before the Court.

12. Attorney Criswell has cited case law *re Broadmoor Place Investments, L.P.*, *994 F2d 744, 746 n. 2 (10th Cir. 1993),* in support of his argument that the Peregrine Trust not be allowed the right to go through with its appeal. This case is hardly applicable or analogous to circumstances pertaining to the Peregrine Trust. In *re Broadmoor Place Investments* there was no failure to provide service or evidence of collusion between the debtor and approved bidder. The Peregrine Trust contents both failure of proper service and collusive activities have seemingly gone on throughout the bidding process. None of which the Trustee or Mr. Criswell deny.

It is most interesting to note, in Peregrine Trust's favor, that in *re Broadmoor Place Investments* the appeal court concluded that had failure to provide service or evidence of collusion between the debtor and approved bidder been found to be true the "disappointed prospective bidder" would not have lost on appeal. For this reason the Peregrine Trust should let the Bankruptcy Appeals Panel run its course in deciding this matter.

13. Criswell and Eiler have turned a blind eye to collusion that has been allowed to take place between parties during the bidding process. For instance the following evidence is undeniably true.

14. Patrick Imeson of Black Diamond admitted under oath on February 25, 2015 that he and the debtor, Ray Weilage have since 2012 attempted to put a deal together, cinching Black Diamond's collusive activity with the debtor.

MOTION TO DISQUALIFY
THE TRUSTEE'S ATTORNEY

15.  Jeff McCarroll of Everwhat Minerals has also admitted to having dealt with Ray Weilage over the Buffalo Mine for years.  After several decades of paying American Amex's claim fees as required by the *Bureau of Land Management (BLM,* Weilage did not suddenly forget to make payment.  It was Ray Weilage and Jeff McCarroll's collusion which made it possible for Everwhat, located 7-8 states away in Louden, Tennessee, to pay those claim after their due date on September 1, 2014, or 9 days later.

16.  Bidder Dan Andre of IMS (*Exhibit G*) colluded with Ray Weilage in making its bid as the attached email to Weilage from his previous broker Barry Wolf shows  (*Exhibit H*).

17.  In 2013, the Peregrine Trust caught Ray Weilage and his attorneys D. Blair Clark and Martin Leuenberger attempting to fraudulently sell the dumps and tailings separate from the mine through Michigan companies the Buffalo Mine of Michigan, LLC  (*Exhibits I & J*) and Yehudah Judah, LLC (*Exhibit K*).   When confronted about this, D. Blair Clark said, "Ray Weilage can do anything he damn well pleases in selling the mine".

18.  Criswell and Eiler have hired Martin Leuenberger, not once, but twice to do title work on Buffalo Mine.  Leuenberger is not, nor has he ever been at "arm's length" in this deal, as required by bankruptcy rules of procedure.

19.  Based on all the collusive activity that has occurred in this bankruptcy case, Criswell and Eiler should not have stood still for any attorneys not acting at arm's length benefiting monetarily.

20.  Having a former role in American Amex, Fred Quimby (*Exhibit L*),  the newly appointed Director of American Amex (*Exhibit M*) colluded with Les Kjosness President and CEO

**MOTION TO DISQUALIFY**
                **THE TRUSTEE'S ATTORNEY**

of Armadillo Resources and 10120704 Saskatchewan, Ltd. in submitting a bid. In 2013, Quimby brokered the acquisition and closing of Flagstaff Gold Mine in Baker City, Oregon to Kjosness and Armadillo Resources.

21. What apparently hasn't happened yet is Brad Goergen's clients Sable Palm and Ricky Smith, and Miles Monson's clients Everwhat and Jeff McCarroll haven't informed their respective attorneys of their collusive activity with one another. It is not a coincidence that Sable Palm, Ricky Smith, Everwhat, and Jeff McCarroll are all from Tennessee. The truth concerning this incestuous relationship may come to light during the *Hearing* involving Everwhat, which is scheduled to commence next month. If it does not come to light at this time it most certainly will when the Peregrine Trust files litigation for damages, should this become necessary.

22. Attorney Criswell and Eiler allowed all of the above collusive activity between parties to occur. Consequently, a deal between Everwhat Minerals and Black Diamond has been cut as stated in *Section 11.2* of the *Bankruptcy Land Sale Agreement* established between the Trustee and Black Diamond (*Exhibit N*).

23. Ray Weilage, D. Blair Clark, and Martin Leuenberger have been allowed by Criswell and Eiler to collude together and manipulate this transaction. With Eiler and Criswell in charge, D. Blair Clark was correct by saying that "Ray Weilage can do anything he damn well pleases in selling the mine".

24. The Trust points out too, that in <u>Calpine Corp. v. O'Brien Environmental Energy, Inc.</u>, 181 F. 3d 527, 531 (3rd Cir. 1999) *Calpine Corporation* appealed in order to claim $2,000,000 payable as a break-up fee and another $2,000,000 in expenses and interest after

*Calpine* was unsuccessful with its bid. Some 50 bidders showed up at auction. The highest bid was $435 million. *Calpine* lost the bid and its appeal as it was looking to the debtor's estate for payment. The Peregrine Trust has not made such a claim against the debtor's estate. Should Peregrine Trust become unsuccessful on appeal it will look to Black Diamond, its investor(s) or large backer, and others for the collection of hundreds of millions in damages. *Karr Tuttle,* counsel for the Trust made this point clear in a docket filed during December 2014.

25. Last but not least, Attorney Criswell should be disqualified as he is likely to be called as a witness to testify in a racketeering case (*RICO*) filed by the Peregrine Trust. Attorney Anthony Pacheco of *Jeffer Mangels Butler and Mitchell, LLP (JMBM)* has already sent out Preservation Letters to 8 parties involved in this bankruptcy. Attached is a copy of the letter Mr. Criswell received (*Exhibit O*).

THEREFORE, for all the above reasons, the Peregrine Trust prays the Bankruptcy Court will move to disqualify David Criswell from representing Trustee Eiler, as well as, replace Trustee Eiler.

Presented May __18__, 2015

Erwin Singh Braich, *pro se*
Peregrine Trust
c/o 33474 Kingsley Terrace
Abbotsford, British Columbia
Canada V2S 6J6
erwinsinghbraich@hotmail.com
((647) 949-2471

## CERTIFICATE OF SERVICE

I, Erwin Singh Braich, hereby certify that on May __/8__ 2015, I caused the following document: *Motion to Disqualify the Trustee's Attorney* to be filed electronically with the Clerk of Court through ECF to each party or their attorney on record in this bankruptcy.

Erwin Singh Braich, *pro se*
Peregrine Trust
c/o 33474 Kingsley Terrace
Abbotsford, British Columbia
Canada V2S 6J6
erwinsinghbraich@hotmail.com
(647) 949-2471

May 8, 2015

Robert Vander Bos
Vanden Bos & Chapman, LLP
319 SW Washington Street
Suite 520
Portland, OR 97204

Dear Mr. Vander Bos

I'm glad we had an opportunity to speak this morning. You didn't tell me you graduated from the University of Michigan's Law School. Having lived in Michigan, I've been to the university campus in Ann Arbor a number of times. The gathering place at the "law quadrangle" presents a picturesque description of campus during football season.

Thank you Bob for your candid comments regarding the bankruptcy case of American Amex (case number 12-30656-rld7). I am also of the opinion that we should "pay and go"………….Meaning: finalize this purchase.

Our two main concerns over time have been (1) that the officers of the Bankruptcy Court have not been able to sell the debtor's mining properties, including all 15 claims, in eastern Oregon to the Peregrine Trust; and (2) the sole Trustee of the Trust is adamant about not being forced to sign a blanket waiver releasing everyone involved in this bankruptcy from litigation.

The laws of gravity being such as they are, we feel we need both clarity and security in the present circumstances involving this acquisition as piles of dumps and tailings at the mine straddle both patented and unpatented claims.

Thank you too, for the refreshing comments you made. It was helpful to hear you state up front your unwillingness to jeopardize the standing you have in other large bankruptcy cases, by being confrontational with Trustee Kenneth Eiler.

We do not want to litigate. We just want to close. However, we believe we have been misled by many professionals who have worked on this case, and feel quite jilted with respect to Mr. Eiler. However, I completely understand and appreciate your position regarding Mr. Eiler.

The language, however, that was carved between the Trust's attorneys at *Karr Tuttle* and Mr. Eiler and his attorney is simply not acceptable. One must understand the critical nature of access to this property and other related things.

Mr. Eiler, his attorney David Criswell, and the Trust's attorneys Diana Carey and Michael Feinberg of *Karr Tuttle* didn't seem to understand why we need clarity over claim jumper Everwhat Minerals, LLC.

Some items I forgot to mention this morning, but wanted to tell you after having time to reflect on them, is the Sole Trustee of Peregrine Trust (Erwin Braich) has a deep appreciation for the very excellent work Brent Summers did. My purpose in telling you this is because you mentioned you wouldn't want to cross him or go against the work he performed on this case. Albeit we have professional advice which strongly suggests Mr. Summers should not have left Mr. Braich and the Trust at the altar, Mr. Braich is adamant about the great work performed by Brent, during a lengthy time period in 2013. For this, Mr. Summers is going to receive a half-a-million dollars when we are successful in closing this transaction (that's right you read this correctly $500,000).

To be absolutely transparent with you, Mr. Braich realizes we still owe Mr. Summers' law firm for services rendered in addition to this bonus. I will not get into the reasons as why his outstanding balance for services rendered prior to his withdrawal (approx. $40,000) has not been paid.

We believe also that there is something very smelly in the woodpile, simply because; why would so many skilled professionals of the Court risk their reputation, by making numerous procedural errors in their support of Black Diamond's offer? This simply makes no sense, as the Trust's *Motion for Reconsideration* has enumerated.

It seems obvious that someone with deep pockets and credibility has offered comfort to these same professionals of the court. Otherwise, how could so many individuals be so complacent and/or negligent for no good reason other than allowing Black Diamond become the ultimate purchaser of the debtor's assets.

In addition to acquiring this one property held in bankruptcy, we have already acquired and/or are in the process of acquiring (under strict written contracts) other properties in Baker City, Granite, and Sumpter, Oregon. An enormous amount of capital has been spent on two other continents, not to mention the hiring of executives in management to assist in this global enterprise.

With this said, do you think we can negotiate this successfully with Judge Dunn and another appointed Trustee? We are in favor of Mr. Eiler receiving his fees, even though he made the mistake of stipulating sale to the Trust only if his extortive demands were met.

What do you and your associate (Ann Chapman) think, and again thank you.

Dennis Tribulak

c/o Candlewood Suites
11250 NE Holman Street, Room 406
Portland, OR 97220


Email:   tribcs@gmail.com

Cell phone:   (858) 504-0393



Exhibit B

*Exhibit C*

From: DCarey@karrtuttle.com
To: Erwinsinghbraich@hotmail.com
CC: janice.grubin@leclairryan.com; Ilan.Markus@leclairryan.com; MFeinberg@karrtuttle.com
Subject: update
Date: Fri, 16 Jan 2015 16:51:07 +0000

1)    This morning, I discussed with Trustee Eiler and his counsel David Criswell the two points raised in yesterday's call:

a.    Regarding 3.3.c, Eiler agreed that IF he is unable to provide clear title to the unpatented mining rights, he will quit claim to the Trust

Whatever rights he has (Dennis had requested this and Eiler agreed it was reasonable).

b.    Regarding the releases, Trustee says they absolutely require finality and cannot wait til the second closing for the releases to be effective. He did agree, though, to move it from "upon court approval" to the first closing.  Eiler will send a redline incorporating these changes later today.

Eiler wanted me to assure you this is NOT personal, but a standard bankruptcy requirement [and I concur, even though I argued strongly for your requested change.]

YOU NEED TO ADVISE ME ASAP IF THIS IS ACCEPTABLE AND YOU WANT TO PROCEED.

2)    I have not yet received the wire confirmation.  Please let me know if/when it was sent.  As you know the $250,000 is due today (plus our retainer).    Unless this is in my trust account today, this transaction will not proceed and there will be no hearing in Portland on Tuesday.

I strongly recommend, as I'm sure do my colleagues Michael, Ilan and Janice (I have taken the liberty of updating them via this email), that the Trust accept these terms.  You are very close to your goal, and  we would like to see the Trust put the past happenings behind it and move expeditiously toward closing of this sale.  We collectively believe this is in your best interests.

I am in court much of today, but await your text/email (and confirmation of the wire from our accounting dept.)

Kind regards,

Diana

**DIANA K. CAREY**

**ATTORNEY AT LAW** | DCAREY@KARRTUTTLE.COM | OFFICE: **206.224.8066**

**KARR TUTTLE CAMPBELL** | 701 Fifth Avenue, Suite 3300 | Seattle, WA 98104 | **www.karrtuttle.com**

*Exhibit D*

From: Janice.Grubin@leclairryan.com
To: DCarey@karrtuttle.com; erwinsinghbraich@hotmail.com
CC: Ilan.Markus@leclairryan.com
Subject: RE: Chapter 11 or 7??
Date: Fri, 2 Jan 2015 18:17:22 +0000

I would say that part of our objection is that eiler should have moved to amend the prior sale orders, rather than vacate them, since ilan tells me that erwin wants to preserve the trust's offer under the chapter 11 plan.

And if there were breaches of that contract, there should have been a hearing, with evidence and rulings, not some unilateral determination by eiler and a 1 day motion.

I will be weaving that into my objection.

**Janice B. Grubin**
**Attorney at Law**
LeCLAIRRYAN
885 Third Avenue, Sixteenth Floor
New York, New York 10022
(212) 634-5016 Direct
(212) 634-5062 Fax
(917) 734-9614 Mobile
Janice.Grubin@leclairryan.com
http://www.leclairryan.com



**Fidelity National Title®**
Company of Oregon

# ONE PARTY ESCROW AGREEMENT

Lori Medak, Senior Escrow Officer
Fidelity National Title Company of Oregon
900 SW 5th Avenue
Portland, OR 97204
Phone: (503)222-2424  Fax: (503)227-2274

**Date:** May 15, 2015
**Escrow No.:** 45141506323-LM

I/We hand you funds in the sum of $250,000.00 No/100 Dollars ($250,000.00), which you are instructed to deposit into your non-interest bearing client trust account, for the credit of the undersigned. You are to hold said funds until you have received from the undersigned, a written demand for refund of herein deposited funds or for the release of funds pursuant to a purchase of property pursuant to U.S. Bankruptcy Case Number 12-3065-rld7 AND Notice of Appeal and Statement of Election under Case Number 12-30656-rld7.

CONDITIONS TO RELEASE OF FUNDS: It is the intent of the undersigned party to authorize Escrow Holder, Fidelity National Title Company to immediately release $250,000 "nonrefundable" to the Bankruptcy Court and involving American Amex, Inc., a Nevada corporation, as debtor, subject to:

Court's approval of the Peregrine Trust as the rightful buyer of the debtor's "3 patented mining claims" located in Grant County, Oregon, and commonly known as the Buffalo Mine. This closing was previously identified by the Court as "Phase I" and was approved in January 2015 by Mr. Eiler in negotiations with the Trust's counsel, Karu Tuttle, attorneys Diana Carey and Michael Feinberg. Phase I is a proposed $13m closing with the Trust also paying $2m in broker commissions.

Clarity by the Court as to a decision on what will happen with Everwhat Minerals, LLC and Han Je-Rush Gold Royalty

Clarity as to Item 11.2 Restriction on Transfer of the contract with Black Diamond with respect to the to debtor's assets the undersigned party is attempting to purchase.

Once the Peregrine Trust has been approved by the Court with no further options for subsequent bidders a Joint Escrow Account with Fidelity National Title Company as Escrow Holder will be opened in order to receive $1,000,000 "refundable" within 10 days after the $250,000 has left escrow; and $13,750,000 within 21 days thereafter; for a closing date no later than 40 days from when the initial $250,000 left escrow. The $13,750,000 includes $2,000,000 which will be payable to Georgia brokers. Likewise, these payments involve American Amex, Inc., a Nevada corporation, as debtor.

DURATION OF HOLDBACK ACCOUNT. Funds will be held in escrow for an initial period of 6 months from the date of receipt of funds. The undersigned party will have a one time option to extend the duration of the holdback account for an additional 6 month. If Escrow Agent has not received instructions authorizing either a refund of sums held or a release of funds to the Bankruptcy Court or a Joint Escrow Account, Escrow Agent will refund the deposit being held to the undersigned party.

# ONE PARTY ESCROW AGREEMENT
### (continued)

Escrow Holder will collect a fee in the amount of $500.00 for holding said funds.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

The Peregrine Trust

BY: _[signature]_         May 18/15

Name: ERWIN S. BRAICH       Date

Title: SOLE TRUSTEE

*Exhibit F*

**FILED**

APR 21 2005

HAROLD S. MARENUS, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**ORDERED PUBLISHED**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No.   CC-04-1350-KMoSn |
| KAVEH LAHIJANI, | Bk. No.   SV 98-15561-AG |
| Debtor. | |
| KAMIAR SIMANTOB; NASSER LAHIJANI, | |
| Appellants, | |
| v. | **OPINION** |
| CLAIMS PROSECUTOR, LLC; BRYAN MASHIAN; PETER C. ANDERSON, Chapter 7 Trustee, | |
| Appellees. | |

Argued and Submitted on January 20, 2005
at Pasadena, California

Filed – April 21, 2005

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Arthur M. Greenwald, Bankruptcy Judge, Presiding

Before:  KLEIN, MONTALI, and SNYDER,* Bankruptcy Judges.

---

*Hon. Paul B. Snyder, Bankruptcy Judge for the Western
District of Washington, sitting by designation.

1   KLEIN, Bankruptcy Judge:

2

3       What is in a name?  Sometimes a lot – of misinformation.  If

4   ever there was a misnomer, it is the name of appellee, "Claims

5   Prosecutor, LLC," which should have called itself "Claims

6   Defender" or "Claims Extinguisher" when purchasing the trustee's

7   causes of action to retrieve property allegedly transferred by

8   the debtor.  Its owner, who is both a defendant and the debtor's

9   brother-in-law, concedes that the causes of action will not be

10  prosecuted and elected in open court not to attempt to establish

11  that the purchase was in "good faith" for purposes of the 11

12  U.S.C. § 363(m) statutory safe harbor from appellate remedies.

13      This appeal ties together a number of our recent decisions.

14  We have held that the question whether a purchaser at a court-

15  approved sale acted in § 363(m) "good faith" is to be determined

16  by the trial court with findings based on evidence and that the

17  safe harbor can be waived by omission to present such evidence.[1]

18  We have held that sale of avoiding actions may simultaneously

19  implicate § 363 "sale" analysis and "compromise" analysis under

20  Federal Rule of Bankruptcy Procedure 9019(a).[2]  We have also

21  explained that 11 U.S.C. § 503(b)(3)(B) recognizes that courts

22  may authorize a creditor to sue in the name of the trustee, at

23  its own expense (but subject to reimbursement under § 503(b)), to

24  _____

25      [1]T.C. Investors v. Joseph (In re M Capital Corp.), 290 B.R.
    743, 745 (9th Cir. BAP 2003); Thomas v. Namba (In re Thomas), 287
26  B.R. 782 (9th Cir. BAP 2002).

27      [2]Goodwin v. Mickey Thompson Entm't Group, Inc. (In re Mickey
    Thompson Entm't Group, Inc.), 292 B.R. 415, 421 (9th Cir. BAP
28  2003) ("Mickey Thompson").

                                    2

recover property transferred by a debtor.[3]

We now conclude that, when a cause of action is being sold to a present or potential defendant over the objection of creditors, a bankruptcy court must, in addition to treating it as a sale, independently evaluate the transaction as a settlement under the prevailing "fair and equitable" test, and consider the possibility of authorizing the objecting creditors to prosecute the cause of action for the benefit of the estate, as permitted by § 503(b)(3)(B). Accordingly, we REVERSE the order approving the sale of the estate's causes of action under § 363.

FACTS

Kaveh Lahijani filed a chapter 7 bankruptcy case in April 1998. Discharge was entered in August 1998. The case was closed as a no-asset case in August 1999.

Nine months after the bankruptcy case was closed, the appellants Kamiar Simantob and Nasser Lahijani (joined by one other person), who had not been scheduled as creditors and did not otherwise know of Kaveh Lahijani's bankruptcy, sued him and others in state court in an effort to recover about $10 million that they alleged was embezzled before the bankruptcy.

The action, <u>Simantob, et al. v. Lahijani, et al.</u>, sounding in fraud, was filed in a state court in May 2000.[4] It alleged

---

[3]<u>COM-1 Info, Inc. v. Wolkowitz (In re Maximus Computers, Inc.)</u>, 278 B.R. 189, 197-98 (9th Cir. BAP 2002) ("<u>Maximus Computers</u>"); <u>accord</u>, <u>In re Godon, Inc.</u>, 275 B.R. 555, 561-63 (Bankr. E.D. Cal. 2002) ("<u>Godon</u>").

[4]Kamiar Simantob, Kamran Simantob & Nasser Lahijani v. Kaveh
(continued...)

3

misrepresentation, concealment, rescission, conspiracy, breach of fiduciary duty, constructive trust, and conversion.

While the state court action was pending, the bankruptcy case was reopened and appellee Peter C. Anderson was appointed chapter 7 trustee. The appellants filed a $9,786,000 proof of claim (all claims total about $13 million) and commenced an adversary proceeding to have the debtor's discharge revoked or have the debt excepted from discharge.

The net result of three years of convoluted state and federal litigation was that, by October 2003, the appellants had lost in state court on all substantive claims for relief and had not succeeded in having the discharge revoked or the debt excepted from discharge.

Left with a simple debt that was subject to a valid discharge, the appellants' only remaining avenue for recovery was to maximize the value of the bankruptcy estate available for distribution to creditors. This they proposed to accomplish through the exercise of the trustee's powers to avoid and recover property that the appellants believed Kaveh Lahijani had fraudulently transferred.

Since the trustee (who says he is unable to evaluate the underlying merits and, in any event, lacks the funds necessary to wage war) was unwilling to pursue the fraudulent transfer and turnover causes of action, the appellants offered to purchase

---

[4](...continued)
Lahijani, Micha Mottale, Venice & Vermont, Inc., Bahman ["Bryan"] Mashian, Buchalter, Nemer, Fields & Younger & Does 1 - 100, No. BC231307, Los Angeles County Super. Ct., filed 5/22/00.

4

them for a price of one-half of net recoveries.

The appellants' proposal operated to put the avoiding power causes of action into play as assets that could be auctioned.

Kaveh Lahijani's brother-in-law and co-defendant, Bashan "Bryan" Mashian, formed appellee, Claims Prosecutor, LLC ("'Claims Prosecutor'"), in order to acquire the avoiding power causes of action, offering $30,000.

The chapter 7 trustee evaluated the appellants' 50 percent offer as more beneficial to the estate than $30,000 and filed a motion for permission to assign his trustee avoiding powers to the appellants, subject to overbid.

When "Claims Prosecutor" raised its offer to $100,000, the trustee switched positions and proposed to accept that offer, subject to overbid and court approval.

The trustee subsequently issued a supplemental notice of a contested sale hearing at which the estate property would be auctioned. Pursuant to the notice, which purported to detail overbid procedures, both initial and subsequent overbids had to be in cash or cash equivalent.[5]

---

[5]The property being sold was described as:

any and all assets of the Estate whether real, personal or otherwise including, but not limited to, the following: any and all known or unknown claims, suits, contracts, judgments, demands, damages, debts, obligations, lawsuits, causes of action, losses, penalties, fines, liabilities (including strict liability), encumbrances, liens, costs or expenses, whether or not ultimately defeated, of whatever kind, nature or description, contingent or otherwise, matured or unmatured, foreseeable or unforeseeable, including [fees and expenses].

(continued...)

At the sale hearing on June 2, 2004, the trustee insisted that only cash or cash equivalent offers were acceptable to him. He did not explain why percentage offers were unacceptable.

During the bidding, the appellants offered a number of overbids that included additional percentage recoveries for the estate ($101,000 + 10 percent; $110,000 + 25 percent; and $130,000 + 25 percent). The trustee objected to the percentages because he wanted a sum certain so the case could be closed.[6] When the appellants persisted, they were effectively forced to state their bids without adding percentages of recoveries, even though they made a record that they wanted to do so.[7] Their

---

[5](...continued)
Supplemental Notice of Trustee's Motion to Assign Avoiding Powers to Simantob, Subject to Overbid, filed 5/25/04, at 4.

[6]The relevant colloquy was:

    [APPELLANTS' COUNSEL]: We'll bid $110,000 plus a 25 percent interest in the recovery.
    COURT: Well, is the Trustee going to object? There may not be a recovery, but they're offering to give a 25 percent recovery.
    [TRUSTEE'S COUNSEL]: ... [B]ecause of the nature of facilitating overbids in this case, we do not want a percentage of the recovery included in the items. We want the sale over with, the Trustee's involvement with that portion of the case over with. ...
    COURT: Well, what does the Trustee deem to be the value of this recovery at this time?
    [TRUSTEE'S COUNSEL]: Your Honor, other than the offers that are made, the Trustee has no way of determining the value of those claims. He has no resources to pursue those claims. So to the estate as it stands right now without any bids, the claims are not of any value to the estate.

Tr. 6/2/04 hearing, at 33.

[7]For example, when appellants offered $130,000, plus 25 percent of the recovery, the following colloquy occurred:
                                                        (continued...)

6

final bid was for $160,000.[8]

The court authorized the trustee to sell the causes of action to "Claims Prosecutor", for its high bid of $175,000 and, as a back-up, to appellants for $160,000.

When the court was asked to find that the purchaser was acting in "good faith" within the meaning of § 363(m) so that the

---

[7](...continued)
　　[APPELLANTS' COUNSEL]: We bid $130,000, again, plus 25 percent of any recovery. ...
　　[TRUSTEE'S COUNSEL]: The Trustee will not accept the portion that is a percentage of the recovery.
　　COURT: ... [are] you going to withdraw your bid?
　　[APPELLANTS' COUNSEL]: No, your honor
　　COURT: Or are you going to modify it to limit it to the $130,000?
　　[APPELLANTS' COUNSEL]: Well, we're offering that in addition to the $130,000 cash. It's not contingent.
　　COURT: I understand, and the Trustee is not accepting that. So then the question is what do we do with your bid. ... Are you going to reject the bid or are you going to ask that the bid be limited to the $130,000?
　　[APPELLANTS' COUNSEL]: Well, if I'm forced to do so, the bid will be limited to the $130,000. ...
　　[TRUSTEE'S COUNSEL]: The only portion that we would accept, your Honor, is the $130,000 bid. If that bid is made at $130,000 without any percentages, we would accept...
　　COURT: Your bid. You want to modify your bid?
　　[APPELLANTS' COUNSEL]: Yes, we do, your Honor, but <u>I want to make it clear for the record that we're offering a percentage of the recovery</u> ...
　　　COURT: I think the record is clear as to how the trustee wants to deal with that.

Tr. 6/2/04 hearing at 38-43 (overlapping speech corrected) (emphasis supplied).

[8]Appellants did not add a percentage to their $160,000 bid. At oral argument, counsel explained to us that he believed he had already made his record on the point and was reluctant to risk annoying the trial judge. Under the circumstances, we do not believe appellants waived their right to urge on appeal that their fixed amount "plus percentage" bid be considered.

sale could not be upset on appeal,[9] it (correctly) noted that our § 363(m) decisions in <u>Thomas</u> and <u>Mickey Thompson</u> emphasize the need for evidence to support such a finding and then declined to make a finding unsupported by evidence.

"Claims Prosecutor" declined the court's offer to take testimony directed to the question of § 363(m) "good faith" and represented that the transaction would proceed without the benefit of a finding of "good faith."

This timely appeal ensued.

## JURISDICTION

The bankruptcy court had jurisdiction via 28 U.S.C. §§ 1334 and 157(b)(1). We have jurisdiction under 28 U.S.C. § 158(a)(1).

## ISSUES

1. Whether the court applied the correct legal standard when approving a § 363 sale of causes of action to a defendant for a sum certain over objection by the main creditor in the case, who wanted to pursue the causes of action.

2. Whether the sale of causes of action to defendants in

---

[9]That safe harbor section provides:

(m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity <u>that purchased or leased such property in good faith</u>, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m) (emphasis supplied).

8

this instance meets the requirements for approving a compromise as "fair and equitable."

STANDARD OF REVIEW

Sales under § 363 are reviewed for abuse of discretion. Moldo v. Clark (In re Clark), 266 B.R. 163, 168 (9th Cir. BAP 2001). It is an abuse of discretion to apply an incorrect legal rule. Maximus Computers, 278 B.R. at 194.

DISCUSSION

This appeal involves the sale of causes of action to a defendant over the opposition of creditors. The rules governing sales are implicated, as are the rules governing compromises.

I

Bankruptcy trustees are permitted to sell property of the estate not in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1).

Objections to sale that are based on inadequacy of price are often resolved by the court ordering an auction, which may occur in open court. Fed. R. Bankr. P. 6004(f).

Causes of action owned by the trustee are intangible items of property of the estate that may be sold. These include causes of action owned by the debtor as of the filing of the case. 11 U.S.C. § 541(a)(1). In addition, property recovered by the trustee pursuant to, inter alia, turnover and avoiding powers, is property of the estate. 11 U.S.C. § 541(a)(3).

Causes of action that exist independent of bankruptcy are

9

commonly sold by bankruptcy trustees under § 363(b).

While there is some disagreement among courts about the exercise by others of the trustee's bankruptcy-specific avoiding power causes of action, the Ninth Circuit permits such actions to be sold or transferred. Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.), 177 F.3d 774, 781 (9th Cir. 1999) ("P.R.T.C."); Briggs v. Kent (In re Prof'l Inv. Props. of Am.), 955 F.2d 623, 625-26 (9th Cir. 1992).[10]  Thus, we focus first on the transaction under ordinary sale rules.

A

We reject appellants' argument that the avoiding power causes of action should not have been sold to one who would not exercise the powers for the benefit of all creditors.

The difficulty with this argument is that, under the law of the circuit, trustee avoiding powers may be transferred for a sum

---

[10]Most decisions that wrestle with this problem overlook a key statutory analysis that resolves the issue with respect to recovery of property transferred or concealed by the debtor and that, to that extent, makes the P.R.T.C.-Briggs analysis unnecessary.  The Bankruptcy Code recognizes, albeit obliquely, that a court may authorize a creditor to prosecute an action to recover property transferred or concealed by the debtor, suing in the name of the trustee but at the creditor's risk and expense, and authorizes reimbursement under 11 U.S.C. §§ 503(b)(3) & (4) in the event of success. Maximus Computers, 287 B.R. at 197-98; Godon, 275 B.R. at 561-69.  Thus, it is neither necessary for the trustee to transfer a cause of action to recover property transferred or concealed by the debtor, nor to employ a creditor's attorney as "special" counsel, in order to permit a creditor to prosecute such an action.  Note, however, that P.R.T.C.-Briggs sweeps broader than § 503(b)(3)(B) because it applies to all causes of action owned by the trustee and does not purport to be limited to recovery of property transferred or concealed by the debtor.

certain.  P.R.T.C., 177 F.3d at 781-82; Briggs, 955 F.2d at 625-
26.  The benefit to the estate in such circumstances is the sale
price, which might or might not include a portion of future
recoveries for the estate.  Thus, P.R.T.C. and Briggs do not
mandate, as appellants contend, that the avoidance powers can
only be sold to a creditor who agrees to pursue those avoidance
powers for the benefit of all creditors.

To be sure, the common-sense of appellants' argument is
captured by the statutory authorization under §§ 503(b)(3) & (4)
that permits a creditor, with the permission of the court, to sue
in the name of the trustee to recover, for the benefit of the
estate, transfers made by the debtor.  Maximus Computers, 287
B.R. at 197-98; Godon, 275 B.R. at 561-69.

While one may wonder whether the analysis in P.R.T.C. and
Briggs would have been the same if the Ninth Circuit had had the
benefit of the subsequently-articulated Maximus Computers-Godon
analysis of §§ 503(b)(3) & (4), P.R.T.C. and Briggs stand for a
broader proposition that extends beyond creditors and that
extends beyond the recovery of property transferred by the
debtor.  Moreover, it is law of the circuit that we must follow.

Viewed as a sale, the question, thus, boils down to whether
the sale price to "Claims Prosecutor" created a greater benefit
to the estate than the best offer of appellants.


B

The court's obligation in § 363(b) sales is to assure that
optimal value is realized by the estate under the circumstances.
The requirement of a notice and hearing operates to provide both

11

a means of objecting and a method for attracting interest by potential purchasers. Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection. Nevertheless, particularly in the face of opposition by creditors, the requirement of court approval means that the responsibility ultimately is the court's.

The trustee in this instance refused to entertain bids that included a fixed percentage of net proceeds in addition to a sum certain. In effect, he valued the fixed percentage at zero, which he purported to justify on the basis that he had no way to value the merits of the causes of action being sold. The court deferred to the trustee, accepted the trustee's zero valuation of net litigation proceeds, and essentially required the appellants to stop adding a percentage to their offers. They acquiesced after making a record that they wished to continue to add percentages. After bidding $160,000, they let "Claims Prosecutor's" $175,000 bid stand.

Two facets bear on the analysis of the question whether the $175,000 is an appropriate price for the sale. First, there is the problem of thin competition. Second, there is the question whether $175,000 was actually the higher bid in the face of the additional percentage offered by appellants.

The price achieved by an auction is ordinarily assumed to approximate market value when there is competition by an appropriate number of bidders. When competition is constrained, however, the price is less likely to be reliable and should be examined more carefully. The sale of a cause of action to a

defendant in circumstances in which the plaintiff is the only competitor is an example of constrained competition that warrants more scrutiny.

When the facades are stripped away in this case, the only bidders were a defendant (who apparently was acting in the interest of all fellow defendants) and the plaintiffs (creditors who held about 70 percent of the debt). While the plaintiffs (our appellant) did not bid more than $160,000, they were willing to add, even though the trustee did not want to hear it, a portion of the net return. The trustee's zero valuation does not inspire confidence in his business judgment.

In addition, it is debatable that $175,000 was actually the high bid in light of the standing offer of a percentage of the net litigation proceeds.[11] An economist would place an "expected value" on such a proposition and discount it to "present value," based on a calculation that, in its simplest form, is the product of the possible result, multiplied by the probability of achieving the result, discounted to present value.[12] The crucial

_____

[11]We are mindful that the final bid by appellants did not state that a percentage of litigation proceeds was also being offered. Under the circumstances, appellants had made a record that amply establishes the percentage additive. In view of the high proportion of appellants' claim in relation to total claims that would cycle a majority of those funds back to appellants, there is no rational reason appellants would have voluntarily ceased including the percentage sweetener.

[12]Present value analysis is a well-understood proposition of elementary economics. PAUL A. SAMUELSON & WILLIAM D. NORDHAUS, ECONOMICS 201-02, 271-73 (14th ed. 1992); EUGENE F. FAMA & MERTON H. MILLER, THE THEORY OF FINANCE 27-29, 209-211 (1972). As applicable, here, for example, a probability of .05 (one chance in twenty) of recovering $1 million in three years with a discount rate of 10

(continued...)

point for purposes of the present analysis is that, so long as the pertinent probability is not zero, the expected and present value calculation will yield some value. Any such value should be taken into account.

The consequence is that there is good reason to think that "Claims Prosecutor" was not actually the high bidder. Since it elected to proceed without a determination that it was a "good faith" purchaser within the meaning of § 363(m), there is no impediment to reversing and remanding so that the trial court can evaluate the sale in a manner that gives appropriate value to the appellants' bid.

## II

There is, moreover, a problem more fundamental than the sale price.

Since the transaction amounted to acquisition of causes of action by a defendant for $175,000, Mickey Thompson teaches that it must also be analyzed as a compromise as to which the court has an independent duty to determine whether it is "fair and equitable." Mickey Thompson, 292 B.R. at 420-21.[13]

---

[12](...continued)
percent would be valued as follows. First, ascertain the expected value in the future period: .05 x $1,000,000 = $50,000. Second, compute the present value by dividing by 1.1 (i.e., 1 + 10 percent) to the third power (because the period is three years): $50,000 ÷ (1.1 x 1.1 x 1.1) = $50,000 ÷ 1.331 = $37,565.74. Id. Hence, the present value of one chance in twenty of recovering $1 million after three years is $37,565.74.

[13]This is also a corollary of the appellate standing rule that, in the context of a sale or other disposition of estate assets, creditors have standing to appeal, but disappointed
(continued...)

14

The fair and equitable settlement standard, originally established by the Supreme Court in <u>TMT Trailer Ferry</u>, requires consideration of: (a) probability of success in the litigation; (b) collectability; (c) complexity, expense, inconvenience, and delay attendant to continued litigation; and (d) the interests of creditors, which are said to be "paramount." <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424-25 (1968) (Bankruptcy Act); <u>Woodson v. Fireman's Fund Ins. Co. (In re Woodson)</u>, 839 F.2d 610, 620 (9th Cir. 1988); <u>Martin v. Kane (In re A & C Props.)</u>, 784 F.2d 1377, 1380-81 (9th Cir. 1986); <u>Mickey Thompson</u>, 292 B.R. at 420.

None of this analysis, which is inherently fact-intensive, relative, and contextual, was undertaken by the bankruptcy court.

Some of these issues appear to cut in favor of appellants. Since the interest of creditors is said to be of "paramount" importance and entitled to deference, and since appellants hold the majority of the debt in the case, their position on the amount of the settlement deserves more credence than it received.

Correlatively, while keeping the case open during the life of the anticipated litigation would entail delay, there would be little or no cost to the estate. If, as here, the creditors

---

[13](...continued)
prospective bidders who are not creditors usually do not have standing to appeal. <u>Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)</u>, 181 F.3d 527, 531 (3rd Cir. 1999); <u>accord</u>, <u>Licensing by Paolo, Inc. v. Sinatra (In re Gucci)</u>, 126 F.3d 380, 388 (2d Cir. 1997).

holding the majority of the claims filed in the case desire to forego the quick payment of what they see as a small dividend and are willing to bear the expenses, their position on this factor is likewise entitled to deference.

Appellants' suggestion that the other creditor that appeared was an LLC that was controlled by the owners of "Claims Prosecutor" has some intuitive appeal. Yet, that possibility is a factual matter that would have to be developed in proceedings in the bankruptcy court.

On balance, the record before us is not adequately developed so as to enable an informed determination.

By not addressing the fair and equitable settlement standard, the bankruptcy court applied an incorrect legal standard and thereby abused its discretion.

Accordingly, the matter needs to return to the bankruptcy court for appropriate proceedings.


B

On remand, the bankruptcy court should consider the alternative of permitting the objecting creditors to sue in the name of the trustee, but at their own risk and expense, to recover the property allegedly transferred by the debtor.

As explained in <u>Maximus Computers</u> and in <u>Godon</u>, this alternative is recognized by §§ 503(b)(3)(B) and (4) and carries forward a provision from former Bankruptcy Act § 64a(1).[14]

---

[14]The House and Senate Reports to the 1978 Bankruptcy Code each state, in identical language, that § 503(b) "is derived
(continued...)

A crucial rule of construction regarding the transition from the Bankruptcy Act to the Bankruptcy Code was that judge-made doctrines were presumed to be carried forward except to the extent Congress indicated a contrary intent. See, e.g., Kelly v. Robinson, 479 U.S. 36, 47 (1986).

In the instance of § 503(b)(3)(B), Congress demonstrated an intent to keep the creditor-recovery rule of former § 64a(1) in force and, in addition, codified the judge-made rule that the

_____

[14](...continued)
mainly from section 64a(1) of the Bankruptcy Act, with some changes" and refer to including "a creditor that recovers property for the benefit of the estate." S. REP. No. 95-989, at 66 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5852; H.R. REP. No. 95-595, at 355 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6311.

Former Bankruptcy Act § 64a(1) provided, in relevant part:

> a. The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates ... : (1) ...; where property of the bankrupt, transferred or concealed by him either before or after the filing of the petition, is recovered for the benefit of the estate of the bankrupt by the efforts and at the cost and expense of one or more creditors, the reasonable costs and expenses of such recovery;

Bankruptcy Act § 64a(1), 11 U.S.C. § 104(a)(1) (redesignated from § 64b(2) in 1938) (repealed 1978).

The change made in 1978 was to codify the judge-made rule that the creditor obtain permission before recovering property for the benefit of the estate. 11 U.S.C. § 503(b)(3)(B), codifying In re Eureka Upholstering Co., 48 F.2d 95, 96 (2d Cir. 1931) (L. Hand, J.); Godon, 275 B.R. at 562.

Creditor recovery was authorized by a 1903 amendment to the Bankruptcy Act, making explicit what had already been recognized as implicit by judge-made law. Chatfield v. O'Dwyer, 101 F. 797, 799-800 (8th Cir. 1900); Godon, 275 B.R. at 561; 3A JAMES WM. MOORE ET AL., COLLIER ON BANKRUPTCY ¶ 64.104 n.6 (14th ed. rev. 1975).

creditor obtain prior permission.[15]  Godon, 275 B.R. at 562-63.

Under that practice, a creditor acting under the statutory creditor-recovery authority was, and remains, permitted to sue in the name of the trustee to recover the subject property.  Id. The creditor, upon obtaining permission to act, has statutory standing to sue.  Id. at 562-66.

The litigation is conducted at the creditor's risk and expense.  Counsel is employed by, and ordinarily paid by, the creditor.  Maximus Computers, 278 B.R. at 197-98.  Moreover, a lawyer hired by a creditor acting pursuant to § 503(b)(3)(B) is not required to be employed by the trustee under 11 U.S.C. § 327, even though the creditor is suing in the name of the trustee. Id.  Unless the lawyer contracts with the creditor to accept only what compensation may ultimately be awarded after the fact under § 503(b)(4), the creditor is responsible for paying counsel

---

[15]Judge Learned Hand made the classic statement of the prior-permission requirement for the creditor-recovery rule:

> While [§ 64a(1)] does indeed justify such an award after [a] motion to compel the receiver or trustee to undertake a litigation, this is a condition upon the right, at least after a receiver [trustee] has been appointed.  The receiver [trustee] is responsible for the collection of the assets, and he alone can authorize any charges against them.  If any creditor, petitioning or other, learns facts which lead him to suppose that property has been concealed, he may, and indeed he should, advise the receiver [trustee], and if the receiver [trustee] prove slack, he may apply to the referee [bankruptcy judge] to stir him to action.  The referee [bankruptcy judge] or the [district] judge may then authorize the creditor to proceed, and he will be entitled to his reward under [§ 64a(1)], but not otherwise.

Eureka Upholstering Co., 48 F.2d at 96 (L. Hand, J.) (citations omitted).

according to their agreed-upon terms and bears the risk of not being reimbursed.

A creditor's willingness to bear the risk and expense on behalf of the estate for litigating to recover property that would be property of the estate and that would not otherwise deleteriously affect the administration of the estate is a matter that the bankruptcy court is obliged to consider when weighing a compromise that would eliminate the recovery action.

CONCLUSION

The bankruptcy court abused its discretion when it approved the sale of estate assets, including the avoiding power causes of action, to "Claims Prosecutor" without appropriately evaluating appellants' bid and without analyzing the situation through the matrix of the fair and equitable settlement standard. REVERSED and REMANDED for further proceedings consistent with this opinion.

*Exhibit 6*

Agreed to this 22nd day of February, 2015 by:

**American Amex, Inc. a Nevada Corporation**          **International Mining Services, LLC**

_____          _____

Kenneth Eiler                                            Dan M. Andre

Trustee                                                  Managing Member

From: Barry Wolf <barry-wolf@att.net>
Subject: Confidential - Goldberg NDA and "Deal"
To: rweilage@gmail.com
Cc: "Amy Richards" <amy_richards@bellsouth.net>, "Eric Weilage" <eweilage@verizon.net>,
"Kent Weilage" <kweilage@hotmail.com>
Date: Saturday, May 21, 2011, 8:44 AM

Hello Ray.

The NDA that Goldberg presented to you is a textbook example of one of several approaches used by individuals to literally steal mines. There are techniques being utilized that are very sophisticated to create fraudulent ways to secure properties. It's truly terrifying.

Ray, do you remember when we met Steven King, a gold mine owner who lives in Atlanta. He considered purchasing the Buffalo Mine. Steven owns a gold and iron ore mine and I recently contacted him regarding an iron ore inquiry that I'd received. The following is an unfortunate but true story. One of Steve's iron ore mine partners signed a document with a neighboring mine owner regarding an easement. Without reading the document thoroughly, his partner signed the document. Today, he is in a $25 Million lawsuit with his neighbor, who claims to have "ownership" of the property. It appears that the document provided ownership provisions neatly hidden in the body of the document. Steve is fighting for his financial life, as this mine was his retirement. Now, he has accumulated some $500,000 in legal bills to fight the property claim. At this point, he believes that it will take years to resolve and he isn't sure if he'll have the financial capability to continue the fight. In the meantime, he has been ordered to cease mining operations and is in a holding pattern until such time as the lawsuit is resolved.

This is an example of what is happening in the mining industry. I have serious concerns regarding the Goldberg NDA, as it states that there there are no other contracts in place. Signing that document would be fraudulent on your part. Worse yet, this executed document would most likely result in the Buffalo Mine being tied up in litigation long past the debenture deadline. The end result would not be a good one for you.

Ray, I received a call from Joe Goldberg and Dan Andre last Monday. They called to discuss the fact that they were surprised to hear that the property was under contract with another buyer. At that time, Dan indicated that he would not move forward, given the fact that a binding contract was in effect. He also stated that he had no interest in a back-up contract position, but would prefer to move onto other mine acquisitions instead.

Now, let's fast forward four days. I spoke with Dan Andre yesterday and shared with him that I was shocked that he was continuing to pursue a contract on the Buffalo Mine, given the fact that he was fully aware of the existing contract in place. His comment -- he didn't care if there is another contract on the property. He stated that the ultimate decision was Ray's to make. I shared with him that contract law prohibits the execution

of two binding contracts simultaneously and that there could be major repercussions for the seller in this regard. His comment was that he didn't have proof that there was another contract and simply did not care.

Ray, Dan Andre's behavior is not indicative of an honest, professional businessman. Honestly, the $600 Million deal would never happen. Nobody with a high net worth will pay 10 - 15 times more than market for an asset. They became wealthy by being smart. And Yes, I would love to see both you and I benefit immensely from a sale of that magnitude, but let's be realistic. It's not real and it wouldn't happen. Period!

Ray, let's get ready for the closing this week and focus on making sure that the title is ready for transfer. If this honest e-mail offends you, I cannot apologize for the truth. I have been protecting you for some time and value our friendship, but it is time that we close this property with a good buyer and move forward with the next phase of our lives. Let's get it done together!

Best regards.

Barry

**Barry G. Wolf CBB, CCB, CIIIS, CPM**
**President, Wolfstone Realty Advisors, LLC**

**Global HUB International Realty, GA RE License #H-46319 Broker +1.404.775.9606 USA**

**Barry.Wolf@GlobalHUBInternationalRealty.com**

| | | |
|---|---|---|
| **Direct Line:** | +1.678.200.7759 | USA |
| **Conference:** | +1.605.477.2100 | USA |
| **Access #:** | 781539 | |

*Exhibit I*     Page 1 of 1



# LARA
### Department of Licensing and Regulatory Affairs

Michigan.gov Home     Business Entity Search Home | Corps Home | Contact Corporations | LARA Home

## LIMITED LIABILITY COMPANY DETAILS

**Searched for:** BUFFALO GOLD MINE OF MICHIGAN LLC
**ID Num:** D3603M
**Name:** BUFFALO GOLD MINE OF MICHIGAN LLC
**Type:** Domestic Limited Liability Company

**Resident Agent:** ROBERT BEAL

**Registered Office Address:** 39635 S I-94 SERVICE DR   BELLEVILLE  MI  48111

**Mailing/Office Address:**
**Formation/Qualification Date:** 12-21-2009
**Jurisdiction of Origin:** MICHIGAN
**Managed by:** Members
**Status:** ACTIVE, BUT NOT IN GOOD STANDING AS OF 2-19-2013  **Date:** Present

> View Document Images

Return to Search                    New Search

Copyright © 2001- 2014 State of Michigan

Exhibit 5

# Buffalo Gold Mine of Michigan

Investors Information Guide



# DISCOVER GOLD

This Investor Information Guide has been prepared by Buffalo Gold Mine of Michigan for investors; this document is to be used solely for informational purposes.

# Strengthening your Investment Portfolio

Key information you should know.



Location and Resources

Buffalo Gold Mine offers the kind of investment opportunity that allows you to feel confident about increasing your wallet share. Buffalo Mine is the largest mine in the Granite Quadrangle. Its development started in the mid-1880; production records exist from 1903. Since 1903, the Mine has been almost continuously in production, with varying levels of activity. In recent years, efforts were confined to exploration and development of the veins to greater depths and the processing of 750,000 tons of tailings ore.

The Buffalo Mine was discovered around the turn of the 20th century and has been in production for over 65 years. The Mine has gone through extensive development program to upgrade the equipment, roads, tunnels and laboratory.

The current reserve base in the Buffalo Mine is 1,074,295 tons or grading 1,545 ounce of gold per ton and 9.0 ounces of silver per ton. Geological reports indicate a very good possibility of much greater reserves below the 600-foot level. Once report suggests that a surface mining operation would yield potential ore reserves of tens of millions of tons. High-grade ore tailings of approximately 750,000 tons, with an average analysis of 0.633 ounces of gold per ton, are now being processed. 600,000 tons of dumps (approx.) with an average of 0.20 ounces of gold per ton will also be processed with the tailings ore.

The Buffalo Mine is located about five miles northeast of the town of Granite, Grant County, Oregon near Granite Creek, in the Granite mining district.

The mining district is situated within a precious metals belt 30-40 miles wide (N-S) and 100 miles long (E-W); coincident with the core of the Blue Mountains, along the Snake River. The eastern half of the district is in the Wallowa-Whitman Nation Forest, and the western half is in the Umatillo National Forest. The district lies within the outline of the Blue Mountains.

The mine property is located on the rugged and heavily-timbered Elkhorn Ridge, which is part of the Blue Mountains, between the 5,700 to 6,400 foot elevations. Access to the Buffalo Mine is paved road for 41 miles from the town of Baker City via Sumpter, which is 24 miles from Baker City over an all-weather road.



## WHAT SETS US APART FROM OTHER INVESTMENT OPPORUNTIES

The Buffalo Mine has a rich history and has produced strong results based on 10% of the land mined. The Buffalo Mine offers multiple precious metal mining possibilities. The Mine is well documented and several reports indicate massive reserve tonnage. Reports also suggest the total value of the reserves is in excess of $1.8 billion.

## WE MINE THE WORLDS RICHEST MINERALS AND RESOURCES

- Au-Gold
- Ag-Silver
- Pt-Platinum
- Rh-Rhodium
- Os-Osmium
- Ru-Ruthenium
- Pd-Palladium
- Ir-Iridium

# FOR MORE INFORMATION

Who to contact to learn more.

Based on the investment rate and earning potential, investors will receive a through investment analysis briefing and will be provided documents, test results and pictures.

To learn more about this investment opportunity, contact us at: investments@buffalogoldmineofmillc.com or call 1.313.340.0140.

## BUFFALO GOLD MINE OF MICHIGAN, LLC

19448 James Couzens
Detroit, MI 48235
Contact Information: 1.313.340.0140
Email Address: investments@buffalogoldmineofmillc.com

www.buffalogoldmineofmillc.com

orat huic Occuro uxor doloro ut at

Exhibit K

Pg 1

CSCL/CD-700 (Rev. 02/13)

## MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
## CORPORATIONS, SECURITIES & COMMERCIAL LICENSING BUREAU

| Date Received | (FOR BUREAU USE ONLY) | |
|---|---|---|
| AUG 0 8 2013 | | **FILED** |
| | This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document. | AUG 08 2013 |
| | | Administrator Corporation Division |

Tran Info#1 188452511 08/07/13
Chk#: 20495320925  Amt: $50.00
ID: DAVID JOHNSON

| Name | | |
|---|---|---|
| David Johnson | | |
| Address | | |
| 52 Montague Street | | |
| City | State | ZIP Code |
| Belleville | MI | 48111 |

EFFECTIVE DATE:

Document will be returned to the name and address you enter above.
If left blank, document will be returned to the registered office.

## ARTICLES OF ORGANIZATION
### For use by Domestic Limited Liability Companies
(Please read information and instructions on reverse side)

E2593P

Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned executes the following Articles:

**ARTICLE I**

The name of the limited liability company is: Yehuda Judah, LLC

**ARTICLE II**

The purpose or purposes for which the limited liability company is formed is to engage in any activity within the purposes for which a limited liability company may be formed under the Limited Liability Company Act of Michigan.

**RECOVERY OF PRECIOUS METALS**

**ARTICLE III**

The duration of the limited liability company if other than perpetual is: Perpetual

**ARTICLE IV**

1. The name of the resident agent at the registered office is: David Johnson

2. The street address of the location of the registered office is:

| 29 Montague | Belleville | , Michigan | 48111-3519 |
|---|---|---|---|
| (Street Address) | (City) | | (Zip Code) |

3. The mailing address of the registered office if different than above:

| | | , Michigan | |
|---|---|---|---|
| (P.O. Box or Street Address) | (City) | | (Zip Code) |

**ARTICLE V** (Insert any desired additional provision authorized by the Act; attach additional pages if needed.)

Signed this ___1___ day of ___January___ 2013

By _Shmuel Johnson_
_(Signature(s) of Organizer(s))_

David Johnson
_(Type or Print Name(s) of Organizer(s))_

# ARTICLES OF INCORPORATION   *Exhibit L*



Corporation Division
www.filinginoregon.com

**E-FILED**
Jan 08, 2014
**OREGON SECRETARY OF STATE**

**REGISTRY NUMBER**

98875694

**TYPE**

DOMESTIC BUSINESS CORPORATION

**1. ENTITY NAME**

AMERICAN AMEX,INC., A NEVADA CORPORATION

**2. MAILING ADDRESS**

880 ELM STREET SUITE 14
BAKER CITY OR 97814 USA

**3. NAME & ADDRESS OF REGISTERED AGENT**

FRED BUSBY QUIMBY

880 ELM STREET SUITE 14
BAKER CITY OR 97814 USA

**4. INCORPORATORS**

FRED BUSBY QUIMBY

880 ELM STREET SUITE 14
BAKER CITY OR 97814 USA

**5. NUMBER OF SHARES**

10

**6. OPTIONAL PROVISIONS**

The corporation elects to indemnify its directors, officers, employees, agents for liability and related expenses under ORS 60.387 to 60.414.

By my signature, I declare as an authorized authority, that this filing has been examined by me and is, to the best of my knowledge and belief, true, correct, and complete. Making false statements in this document is against the law and may be penalized by fines, imprisonment, or both.

By typing my name in the electronic signature field, I am agreeing to conduct business electronically with the State of Oregon. I understand that transactions and/or signatures in records may not be denied legal effect solely because they are conducted, executed, or prepared in electronic form and that if a law requires a record or signature to be in writing, an electronic record or signature satisfies that requirement.

**ELECTRONIC SIGNATURE**

FRED BUSBY QUIMBY



*Exhibit M*



Secretary of State
Corporation Division
255 Capitol Street NE, Suite 151
Salem, OR 97310-1327

Phone:(503)986-2200
www.filinginoregon.com

**2015 ANNUAL REPORT**
**Registry Number:** 988756-94
**Date of Incorporation:** 01/08/2014
**Fee:** $100.00
**Due Date:** 01/08/2015
**Type:** DOMESTIC BUSINESS CORPORATION

AMERICAN AMEX, INC., A NEVADA ...
880 ELM STREET SUITE 14
BAKER CITY OR 97814

**FILED**

**JAN 21 2015**

OREGON
SECRETARY OF STATE

**Name of Domestic Business Corporation**
AMERICAN AMEX, INC., A NEVADA CORPORATION

**Jurisdiction:** OREGON

The following information is required by statute. Please complete the entire form. If any of the information is incorrect, you can make changes on this form. Failure to submit this Annual Report and fee by the due date may result in inactivation on our records.

**Registered Agent**
FRED BUSBY QUIMBY
880 ELM STREET SUITE 14
BAKER CITY OR 97814

If the Registered Agent has changed, the new Agent has consented to the appointment. Oregon street address required.

**1) Type of Business**

**2) Principal Place of Business** (Str. address,city,state,zip)

Flagstaff Rd & Hwy 86  Box 403
Baker City Oregon  97814

**3) Mailing Address** (Address,city,state,zip)

880 ELM STREET SUITE 14
BAKER CITY OR 97814

**4) President Name and Address**

FRED BUSBY QUIMBY
Flagstaff Rd & Hwy 86
Po Box 403
Baker City, Or 97814

**5) Secretary Name and Address**

Erlinda Quimby
PO Box 403
Hwy 86 & Flagstaff Rd

**6) Signature**

*Fred Quimby*

**7) Printed Name**

Erlinda Quimby

**8) Date**

1/7/2015

AMERICAN AMEX, INC., A NEVADA C



Make check payable to "Corporation Division" and m
**Corporation Division, 255 Capitol ST NE Suite 151, Sa**
Note: You can also fax to (503) 378-4381. Filing fees may
and expiration date on a separate page for your protection.

98875694-15784192     RENANA

ANRPF1 01/07/15

**10.4   Memorandum.** Buyer may file the Memorandum with the county clerk of Grant County, Oregon, and the Bureau of Land Management. Buyer will pay all of the fees, costs, and expenses of recording and/or filing the Memorandum.

## SECTION 11
## COVENANTS OF SELLER AFTER CLOSING

Seller covenants to Buyer that Seller will perform the following obligations and observe the following conditions on and after the Closing Date and until the Purchase Price has been fully paid and the Trustee's Deed has been delivered to Buyer:

**11.1   Ownership of Property.** Seller will keep the Property free from all liens, mortgages, pledges, security interests, and other encumbrances, created after the Effective Date.

**11.2   Restriction on Transfer.** Seller will not Transfer the Property or any interest in any Property to any person other than Buyer except that Seller may (but only with Buyer's prior written consent, which Buyer may withhold in its sole discretion) Transfer an interest in one or more of the Unpatented Mining Claims to settle the pending disputes regarding Unpatented Mining Claims described in Section 6.

## SECTION 12
## COVENANTS OF BUYER AFTER CLOSING

Subject to the competing rights and claims of Everwhat Minerals, Inc. and Han Je-Rush Gold Royalty to the Unpatented Mining Claims, Buyer shall be entitled possess the Property and mine and remove rock from the Property from and after the Closing, and Buyer covenants to Seller that Buyer will perform the following obligations and observe the following conditions on and after the Closing Date and until the Purchase Price has been fully paid:

**12.1   Ownership of Property.** Buyer will keep the Property free from all liens, mortgages, pledges, security interests, and other encumbrances except for liens, mortgages, pledges, security interests, and other encumbrances of record existing as of the Effective Date; and the pending disputes regarding Unpatented Mining Claims described in Section 6.

**12.2   Restriction on Transfer.** Subject to Section 24.2, Buyer will not Transfer the Property or any interest in the Property without Seller's prior written consent, which shall not be unreasonably withheld, conditioned, or delayed.

**12.3   Condition of Property.** Buyer will keep the Property in good repair and condition, reasonable wear and tear excepted, and will not commit or permit any waste of the Property, *provided* that the mining, processing, and mineral recovery methods employed by Buyer, in its sole discretion, shall not be deemed to constitute waste. Buyer will not remove, demolish, or materially alter any improvement existing on the Property on the Closing Date without the prior written consent of Seller, which Seller may not unreasonably withhold, condition, or delay.

*Exhibit O*

# JMBM | Jeffer Mangels Butler & Mitchell LLP

Anthony Pacheco
Direct: (310) 785-5309
Pacheco@jmbm.com

1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
(310) 203-8080  (310) 203-0567 Fax
www.jmbm.com

December 17, 2014

**VIA REGISTERED MAIL & EMAIL**

David W. Criswell
101 SW Main Street, Suite 1100
Portland, OR 97204
Email Address: dcriswell@balljanik.com

> Re:   Document Preservation Request Regarding the Buffalo Mine

Dear Mr. Criswell:

This office represents Satinder Dhillon, a beneficiary of the Peregrine Trust (the "Trust"). We are informed that, in or about 2011, the Trust and another entity named Zuvuya Natural Resources, Inc. ("Zuvuya") contracted with American AMEX, Inc. ("AMEX") to purchase and operate a gold mine and its tailings in Grant County, Oregon (the "Buffalo Mine"). We are further informed that, subsequent to reaching that agreement, AMEX refused to perform its obligation under the agreement to sell the Buffalo Mine to the Trust and Zuvuya.

By this letter, we hereby request that you preserve any and all electronically stored information ("ESI") and hard copies of all documents, communications, records, files, and data in your possession, custody or control that are potentially relevant to the business operations of AMEX, the Trust, Zuvuya, or the Buffalo Mine. Accordingly, we request that you take the steps set forth below to safeguard against the destruction (intentional or accidental) of: (i) any and all ESI related to AMEX, the Trust, Zuvuya, or the Buffalo Mine; (ii) any and all communications between you and AMEX, the Trust, Zuvuya, Sable Palm Development, D. Blair Clark, Kenneth Eiler, M. Vivienne Popperl, Martin Leuenberger, Brent Summers, Patrick Gregg, Tara J. Schleicher, Erwin Singh Braich, and/or Ricky Smith, including, but not limited to, any and all written communications, electronic communications, and recordings or notes of telephonic or voice communications; (iii) any and all documents sent to you by or on behalf of the parties named above, whether directly or through an intermediary; and (iv) any and all documents related to cash transfers by, from, or on behalf of any of the parties named above, whether directly or through an intermediary. All such documents, communications, records, files and data are collectively referred to herein as the "AMEX Documents."

We also request that a copy of this letter be provided promptly to any other persons who are responsible for your computers, computer systems, computer networks and cloud storage systems.

A.    Existing ESI.

1.    ESI to be Preserved:  ESI described below should be preserved:

a)    All electronic mail and information about electronic mail (including message contents, header information and logs of electronic mail system usage) sent or received by you, including without limitation to or from your email account, relating to the AMEX Documents;

b)    All other electronic mail and information about electronic mail (including message contents, header information and logs of electronic mail system usage) relating to the AMEX Documents;

c)    All databases (including all records and fields and structural information in such databases) containing any reference to and/or information relating to the AMEX Documents;

d)    All logs of activity on computer systems that may have been used to process or store electronic data containing information about the AMEX Documents;

e)    All word processing files and file fragments containing information about the AMEX Documents;

f)    All electronic data and file fragments created by application programs which process financial, accounting and billing information about the AMEX Documents;

g)    All electronic files and file fragments containing information from electronic calendars and scheduling programs regarding the AMEX Documents;

h)    All electronic data files and file fragments created or used by electronic spreadsheet programs where such data files contain information about the AMEX Documents; and

i)    All other electronic data containing information about the AMEX Documents.

2.    On-Line Data Storage on Network Drives, Mainframes, Minicomputers and Other Storage Devices:

Until this matter reaches its final resolution, you should not modify or delete any electronic data files that are maintained in on-line storage and/or direct access storage devices which exist as of the delivery of this letter and meet the criteria of



¶¶ 1(a) – (i) of this letter, including on network drives, mainframe computers, minicomputers and cloud storage, unless a true and correct copy of each such electronic data file has been made and steps have been taken to ensure that such copy will be preserved and accessible.

3.     Off-Line Data Storage, Backups and Archives, Tapes, Portable Drives, and Other Removable Electronic Media:

Until this matter reaches its final resolution, all electronic media used for off-line storage, including archive systems, magnetic tapes and cartridges and other media, and cloud storage systems, which contains any electronic data meeting the criteria of ¶¶ 1(a) – (i) of this letter should be preserved.  You should stop any activity that may result in the loss of such electronic data.  This activity includes rotation, destruction, overwriting and/or erasure of such media in whole or in part. Additionally, this activity includes all removable electronic media used for data storage in connection with your computers or computer systems, including portable hard drives, USB or pen drives, flash drives, magnetic tapes and cartridges, magneto-optical disks, CDs, DVDs and all other media, whether used with personal computers, minicomputers or mainframes or other computers, and whether containing backup and/or archive data sets and other electronic data, for all of your computer systems.

4.     Replacement of Data Storage Devices:

Until this matter reaches its final resolution, you should preserve any electronic data storage devices and/or media that may contain electronic data meeting the criteria of ¶¶ 1(a) – (i) of this letter which may be replaced due to failure and/or upgrade or for any other reason.

5.     Fixed Drives on Standalone Personal Computers and Network Workstations:

Electronic data meeting the criteria of ¶¶ 1(a) –(i) of this letter may exist as of the date of delivery of this letter on fixed drives attached to stand-alone microcomputers and/or network workstations.  Until this matter reaches its final resolution, you should not alter or erase such electronic data and should not perform any other procedures (such as data compression and disk de-fragmentation or optimization routines) which may impact such data, unless a true and correct copy had been made of such active files and of completely restored versions of such deleted electronic files and file fragments and unless copies have been made of all directory listings (including hidden files) for all directories and subdirectories containing such files, and unless arrangements have been made to preserve copies.



6.  <u>Programs and Utilities:</u>

    Until this matter reaches its final resolution, you should preserve copies of all application programs and utilities that may be used to process electronic data described in ¶¶ 1(a) – (i) of this letter.

7.  <u>Log of System Modifications:</u>

    Until this matter reaches its final resolution, you should maintain an activity log that documents all modifications made to any electronic data processing system that may affect the system's capability to process any electronic data meeting the criteria described in ¶¶ 1(a) – (i) of this letter.

8.  <u>Personal Computers:</u>

    Please take the following steps immediately with respect to all personal computers used by you.

    a)  A true and correct copy should be made of all electronic data on fixed drives attached to such personal computers, including all active files and completely restored versions of all deleted electronic files and file fragments.

    b)  Full directory listings (including hidden files) for all directories and subdirectories (including hidden directories) on such fixed drivers should be written.

    c)  The copies and listings made should be preserved until this matter reaches its final resolution.

    d)  All portable drives, magnetic tapes and cartridges, and other media in connection with such computers prior to the date of delivery of this letter containing any electronic information relating in any manner to the matters in dispute should be collected and put into storage until this matter reaches its final resolution.

B.  <u>Hard Copy Documents.</u>

    We also request that you take appropriate steps to preserve all paper based documents.

C.  <u>ESI Created Subsequent to this Letter.</u>



Relevant evidence, created in electronic form subsequent to the date of delivery of this letter should be retained and not be destroyed. We request that you take whatever steps are appropriate to preserve such evidence.

Yours Sincerely,

ANTHONY PACHECO
Jeffer Mangels Butler & Mitchell LLP


AXP:ais